Mike DICKSON

v.

STATE of Tennessee, Department of Environment and Conservation, Division of Underground Storage Tanks.

.

Court of Appeals of Tennessee, at Nashville.

Jan. 8, 2003 Session.

April 9, 2003.

Carthel L. Smith, Jr., Lexington, Tennessee, for the appellant, Mike Dickson.

Paul G. Summers, Attorney General and Reporter; Barry Turner, Deputy Attorney General, for the State of Tennessee.

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which PATRICIA J. COTTRELL, J. and DON R. ASH, Sp. J., joined.

## OPINION

The main question we must decide on this appeal is whether Article VI § 14 of the Tennessee Constitution prohibits a state agency from imposing a fine of more than $50. The Chancery Court of Davidson County held that Article VI § 14 did not apply to administrative agencies and that, in any event, a $15,000 fine assessed by the Tennessee Petroleum Underground Storage Tank Board was remedial and not punitive. We hold that the predominant purpose of the fine was punitive but that Article VI § 14 does not apply to the Board. Therefore we affirm the lower court's judgment affirming the assessment of the fine.

### I.

Recognizing that discharges from underground tanks pose a threat to the environment, the Tennessee General Assembly passed the Tennessee Petroleum Underground Storage Tank Act (USTA). The Act made the release of a petroleum substance from an underground tank illegal, Tenn.Code Ann. § 68–215–104, and committed the enforcement of the Act to the Commissioner of Environment and Conservation, Tenn.Code Ann. § 68–215–107. The Act also created a nine-member Board to promulgate rules and regulations, Tenn. Code Ann. § 68–215–112, and to review, upon a timely request, orders or assessments issued by the commissioner, Tenn. Code Ann. § 68–215–119(a)(1). A review of the Board's decision can be obtained through the Tennessee Administrative

Procedures Act. Tenn.Code Ann. § 68–215–119(c).

The Act allows the Commissioner, the Board, or the court to assess a civil penalty up to $10,000 per day for a violation of the Act or any "rule, regulation, or standard pursuant to this chapter." Tenn. Code Ann. § 68–215–121(a)(1). The penalty may be assessed in addition to any damages suffered by the state. *Id.*

Mike Dickson uses three petroleum underground storage tanks in the operation of a service station in Cedar Grove, Tennessee. On April 29, 1996 the Commissioner charged Mr. Dickson with violations of the USTA and Mr. Dickson sought review of the order in a contested case before the Board. Prior to the hearing Mr. Dickson and the Department of Environment and Conservation (TDEC) entered into a settlement agreement which was adopted by the Board in an order dated April 22, 1998. In the order Mr. Dickson admitted violating the Act in the manner set forth in the Commissioner's order and he agreed to a program of compliance. The agreed order assessed Mr. Dickson with $62,500 in civil penalties but specified that all but $5,000 would be purged if Mr. Dickson complied with the order.

Part of the compliance order required Mr. Dickson to file periodic reports of tests conducted to monitor conditions at the site. He contracted with Applied Earth Sciences (AES) to conduct the tests and prepare the reports. The first report was due on March 24, 1999, but AES obtained an extension to April 25, 1999. Despite the extension, the report was not received by TDEC until November 18, 1999. Even then the report was incomplete. A complete report was finally filed on November 23, 1999. Since the agreed order required that reports be filed every six months, the first report arrived at TDEC after the due date for the second report. The second report arrived on January 31, 2000.

TDEC asserted that Mr. Dickson should pay a portion of the contingent civil penalties set forth in the agreed order of April 22, 1998. Mr. Dickson filed a petition with the Board under the Uniform Administrative Procedures Act asking for a declaratory judgment of his liabilities. After a contested case hearing, the Board found that Mr. Dickson had committed two violations of the agreed order and that each violation triggered $7,500 of the civil penalty contingently assessed in the order. Therefore, the Board ordered Mr. Dickson to pay a $15,000 civil penalty.

Under Tenn.Code Ann. § 4–5–322 Mr. Dickson filed a petition to review the Board's order in the Chancery Court of Davidson County. He first contended that he did not violate the agreed order. He also asserted that the Board's civil penalty assessment violated Article VI § 14 of the Tennessee Constitution.

The chancellor held that Article VI § 14 does not apply to administrative agencies; that, in any event, the fines were remedial in nature and not punitive; and that Mr. Dickson had indeed violated the Board's order. The court, therefore, affirmed the Board's order.

## II.

### DOES ARTICLE VI § 14 APPLY TO ADMINISTRATIVE AGENCIES?

Article VI of the Tennessee Constitution, the Judicial Article, has a provision found in § 14 that provides:

> No fine shall be laid on any citizen of this State that shall exceed fifty dollars, unless it shall be assessed by a jury of his peers, who shall assess the fine at the time they find the fact, if they think the fine should be more than fifty dollars.

Therefore, the inquiry in this case boils down to a question of whether this provision applies to the government as a whole or only to the judiciary. Its placement in the judicial article suggests that its effect is limited to judges. This is especially true when we consider that the framers of the constitution placed a general prohibition against excessive fines in the Declaration of Rights. *See* Art. I § 16. But Article VI § 14's broad and general language suggests a wider application.

The opinions of our Supreme Court dealing with Article VI § 14 have come from cases that involve fines imposed by the judiciary, and the court generally recites a fear of a powerful judiciary as a reason for the provision. *See State v. Martin,* 940 S.W.2d 567, 570 (Tenn.1997)(framers sought "to protect citizens from 'excessive' fines fixed by a powerful judiciary"); *State v. Bryant,* 805 S.W.2d 762, 763 (Tenn.1991)("[d]istrust of a powerful judiciary was said to have been the reason for ... the constitutional provision"); *Upchurch v. State,* 153 Tenn. 198, 281 S.W. 462 (1926)(intent was "to prevent judges from imposing unreasonable fines"). However, in its most recent opinion construing Article VI § 14 our Supreme Court acknowledged that little is known about the origin of this provision. *City of Chattanooga v. Davis,* 54 S.W.3d 248 (Tenn. 2001). The Court said,

Article VI, section 14 is unique in the whole of American constitutional law, and no other provision like it may be found either in the Federal Constitution or in any other modern state constitution. Although this provision dates to our first Constitution signed in Knoxville in February 1796, we know little else about its origin. Similar clauses did not appear in any colonial charter, in any early state constitution, including the 1776 North Carolina Constitution, or in the Constitution of the State of Franklin.

Instead, as the Journal of the 1796 Constitutional Convention reveals, the Fifty–Dollar Fines Clause made its first appearance in the jurisprudence of this state on Saturday, January 30, 1796, when it was appended to a proposed draft constitution as section 9 of the article governing the judiciary.

*Id.* at 257.

In a much earlier case, however, the Court had to decide whether Article VI § 14 required the jury to assess the fine when the legislature had set a fixed, determinate fine of $500 for selling a lottery ticket. The Court said:

The above provisions are manifestly an amplification of the provision contained in sec. 16, art. 1, against the imposition of excessive fines.

The English bill of rights particularly declared that excessive fines ought not to be imposed which had a retrospect, according to Sir Wm. Blackstone, to some unprecedented proceedings in the Court of Kings' Bench, in the reign of King James II. The history of this important provision renders it plain that it was aimed at the abuse of the unlimited power of courts in respect to fines, and was not intended as a limitation upon the power of legislation. It is very plain, too, as we think, that the provision in our own Constitution that a fine exceeding fifty dollars cannot be imposed unless assessed by a jury refers to cases where the court has a discretion in fixing the amount of the fine. It can have no application to the case in hand, where the Legislature has peremptorily fixed the fine at five hundred dollars in every case.

This court has repeatedly exercised the jurisdiction to declare an act of the Legislature unconstitutional, but have

also recognized the rule that deference to a co-ordinate branch of the government demanded that an act of the Legislature should not be declared unconstitutional unless it was a plain and palpable violation of the fundamental law.

Such is not this case, as we think. We think that it was entirely regular for the jury simply to say guilty or not guilty by their verdict in these cases. Neither the court or the jury had anything to do in assessing the fine. The law fixed that as a consequence of the verdict, and there was nothing for the court to do but to give judgment in accordance with the law.

*France v. State*, 65 Tenn. 478, 485–86 (1873).

Justice Turney filed a spirited dissent on the ground that the legislature had "laid" the fine where Article VI § 14 prohibited it. He was of the opinion that the provision was in the judicial article because only the courts had the power to enforce the law against crime. 65 Tenn. at 488.

We think that *France v. State* stands for the proposition that Article VI § 14 of our Constitution applies only to the judiciary and not to the government as a whole. We think it is significant that it has been in the judicial article since our first constitution of 1796. *See City of Chattanooga v. Davis*, 54 S.W.3d 248 (Tenn.2001). We also think it is significant that the constitution contains a separate prohibition against excessive fines that does bind the other branches of the government. *See* Article I § 16; *State v. Taylor*, 70 S.W.3d 717 (Tenn.2002).

## III.

### ARE THE ASSESSMENTS REMEDIAL OR PUNITIVE?[1]

#### A.

The chancellor also held that the two $7,500 assessments were remedial rather than punitive. In *City of Chattanooga v. Davis*, 54 S.W.3d 248 (Tenn.2001), the Court recognized that Article VI § 14 "does not apply to assessments greater than fifty dollars when the assessment is not punitive in nature." *Id.* at 259. The Court in *Davis* was dealing with a municipal ordinance and the court adopted a two-step test to help determine whether a monetary assessment is punitive. The court said:

> Accordingly, we hold that a monetary sanction imposed for a municipal ordinance violation falls within the scope of Article VI, section 14 when: (1) the legislative body creating the sanction primarily intended that the sanction punish the offender for the violation of an ordinance; or (2) despite evidence of remedial intent, the monetary sanction is shown by the "clearest proof" to be so punitive in its actual purpose or effect that it cannot legitimately be viewed as remedial in nature.

54 S.W.3d 248, 264 (citing *Stuart v. State Dept. of Safety*, 963 S.W.2d 28 (Tenn. 1998)). There is a further test to help determine whether an assessment satisfies the second prong of the *Stuart* test: "[w]e conclude that the 'clearest proof' of punitive purpose or effect is more properly established by considering whether the totality of the circumstances demonstrates that the statutory scheme truly envisions the pecuniary sanction as serving to reme-

---

1. Our conclusion in Part II of this opinion disposes of the main issue raised by the appellant. If we are correct in that conclusion, the question of whether the assessments are puni-

tive or remedial becomes immaterial. But for the sake of judicial economy we have decided to address this issue also.

dy or to correct a violation." 54 S.W.3d at 265.

■ Thus if the legislative body creating the sanction primarily intended that the sanction punish the offender the inquiry ends. The assessment is punitive. On the other hand, if the legislative body primarily intended the sanction to be remedial, the sanction may still be punitive if it serves no remedial purpose.

■ The statute under which the Board assessed Mr. Dickson is titled "Civil Penalty." Tenn.Code Ann. § 68–215–121. It provides:

(a)(1) Any person who violates or fails to comply with any provision of this chapter, any order of the commissioner or board, any rule, regulation, or standard pursuant to this chapter shall be subject to a civil penalty not to exceed ten thousand dollars ($10,000) per day for each day of violation. This civil penalty may be assessed by the commissioner, the board or the court. Each day such violation continues constitutes a separate punishable offense, and such person is also liable for any damages to the state resulting therefrom.

* * *

(c) In assessing a civil penalty, the following factors may be considered:

(1) The harm done to the public health and/or the environment;

(2) The economic benefit gained by the violator through noncompliance;

(3) The amount of effort put forth by the violator to obtain compliance; and

(4) Any unusual or extraordinary enforcement costs incurred by the commissioner, including compensation for loss or destruction of wildlife, fish, and any aquatic life resulting from the violation.

Part (a) of the statute taken alone looks for all the world like a punitive measure, despite its "Civil Penalty" title. Ten thousand dollars a day for any violation of the statute, rule, or order of the commissioner, without any consideration of the harm done by the violation, has the flavor of punishment. Especially when the statutory violations can include something as simple as a failure to pay the department fees. *See* Tenn.Code Ann. § 68–215–106(3). But parts (c)(1) & (4) of the statute have a different flavor; they could be considered parts of a civil damage remedy. Part (c)(2) also looks like a civil restitutionary remedy, where a wrongdoer may be required to disgorge any profits gained from an unperformed obligation. *See Coca–Cola Bottling Co. of Elizabethtown, Inc.v. Coca–Cola Co.,* 988 F.2d 386 (3d Cir.1993). Part (c)(3) could apply to either remedial or punitive remedies, since good faith may mitigate the punishment in either area. We also note that the factors in part (c) of the statute "may" be considered in assessing a penalty. Neither the Commissioner, the Board, nor the Court is required to apply that part of the statute.

It is difficult to say, whether the legislature's primary purpose in enacting the civil penalty statute was to punish an offender or to provide a civil remedy. Therefore, giving the state the benefit of the doubt, we would not say that Mr. Dickson's assessment was punitive, based on the statute alone.

**B.**

That brings us to the second question: under the totality of the circumstances does the pecuniary sanction serve to remedy or correct a violation?

The penalties were first assessed in the Commissioner's order of April 1996. After seeking a review before the Board, Mr. Dickson entered into an agreed order where he had the choice to enter into a monitoring only program or take corrective action. He elected to enter the moni-

toring program which required the site status monitoring reports every six months. The agreed order provided that Mr. Dickson would pay a civil penalty in the amount of $7,500 if he failed to comply with this requirement in a timely fashion

The Board's final order found that Mr. Dickson failed to submit a Site Status Monitoring Report on April 26, 1999 and failed again on October 20, 1999. Hence the total of $15,000 in penalties.

■ "[R]emedial measures are any 'means by which a right is enforced or the violation of a right is prevented, redressed, or compensated.'" *City of Chattanooga v. Davis,* 54 S.W.3d 248, 269 (Tenn.2001). Sanctions that fit that definition are stopwork orders, the revocation of a permit, and an order to show proof of compliance at the owner's expense. *Id.* A monetary penalty, however, presents a more difficult problem. The Court said in *City of Chattanooga v. Davis:*

> Some examples of truly remedial purposes served by monetary penalties include those that (1) compensate for loss; (2) reimburse for expenses; (3) disgorge "ill-gotten" gains; (4) provide restitution for harm; and (5) ensure compliance with an order or directive, either through the execution of a bond, or as discussed below, through a prospectively coercive fine. Importantly, however, to the extent that a monetary penalty is not designed to serve these or similar goals, it will appear more likely to predominantly serve the purpose of general and specific deterrence. Although we agree that some level of deterrence is present in all remedial measures, when the *predominant* purposes served by the penalty are to provide general and specific deterrence and to ensure overall future compliance with the law, then the monetary penalty should be deemed as

serving punitive purposes for analysis under Article VI, section 14.

*Id.* at 270.

In a footnote the Court said: "[I]f the predominant 'remedial' purpose served by a monetary sanction is ensuring deterrence against future wrongdoing, then the sanction more properly appears to be punitive in its actual purpose or effect." *Id.* The absence of a purge provision was also important to the court's analysis. A fine that is fixed and determinant is predominantly punitive in nature. *Id.* at 272.

■ As we understand the Supreme Court's analysis, the only way a fixed, determinate fine can be considered remedial is when it bears some relationship to the harm caused by the violation, compensates the state for the costs of enforcement, or requires the wrongdoer to disgorge ill-gotten gains. In this case the record does not contain any proof that shows the monetary value of any of these three categories. Therefore, we think the two $7,500 fines must have been assessed primarily to punish Mr. Dickson, and they would be subject to the Article VI § 14 limitation if that provision applied to administrative agencies.

The lower court's conclusion that the fines were remedial is reversed. However, the court's judgment affirming the action of the Board is affirmed. The cause is remanded to the Chancery Court of Davidson County for further proceedings. Tax the costs of this appeal to the appellant, Mike Dickson.