IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 10, 2007

## STATE OF TENNESSEE v. SHAWN McCOBB and MARCUS WALKER

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-08452     Paula Skahan, Judge**

---

**No. W2006-01517-CCA-R3-CD  - Filed September 26, 2007**

---

The defendants, Shawn McCobb and Marcus Walker, were convicted of aggravated robbery, a Class B felony, and sentenced as Range I, standard offenders to ten years in the Department of Correction. In their consolidated appeal, they argue that the evidence was insufficient to support their convictions and the trial court erred in imposing ten-year sentences. Defendant Walker additionally asserts that it was error for the trial court to impose a fine over $50 and allow his impeachment with a prior conviction. Following our review, we affirm the convictions and sentences of the trial court but modify the fines imposed to $50 each.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed as Modified**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and DAVID G. HAYES, J., joined.

Karen Massey, Assistant Public Defender, Memphis, Tennessee, for the appellant, Shawn McCobb; and Lauren Pasley-Ward, Memphis, Tennessee, for the appellant, Marcus Walker.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Anita Spinetta, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

At the defendants' trial, the victim, Marcus Wilson, testified that on August 29, 2004, he worked at a Papa John's Pizza in Memphis delivering pizzas and made his last delivery at approximately 1:45 a.m. to 6350 Windridge Cove. A young man opened the door and asked him to wait there. The same man later returned, told the victim that he had mistakenly brought a ten

rather than a twenty-dollar bill, and again asked that the victim wait at the front door. While he was waiting, the victim was struck in the back of the head with a metal baseball bat. He described the blow by saying, "It felt like you got ran over by an 18-wheeler. Headaches, you know, pain in my head. . . . I think he hit me with all of his might." The victim said that he then ran for his truck but collided with McCobb and fell in the front yard. He was hit in the arm and began crawling toward his truck. He said that two more men came from the carport, and one of them and McCobb told him "to get down on the ground and stay down on the ground." McCobb stood over him "with the bat up in the air like he was getting ready to swing it again" and demanded the victim give him what he had. The victim handed over some checks and cash, but McCobb continued to hold up the bat, asking for more money. The victim gave him two dollars that he had in his other pocket.

Seeing that his assailants had gone back into the house, the victim ran to his truck and drove to his place of employment, where his manager called an ambulance which took him to the hospital. Several days later, he viewed a photographic lineup and identified Walker as the man who "stalled" him at the door just before the robbery and McCobb as the man who hit him in the head with the bat. The victim also made a courtroom identification of McCobb as the man who struck him with the bat and Walker as the one who asked him to wait at the door.

Officer Charmell Smith of the Memphis Police Department testified that on August 29, 2004, she went to the address where the robbery occurred and recovered the victim's glasses from the front yard and his Papa John's cap from the front porch.

Detective Walter Davidson of the Memphis Police Department Robbery Squad testified that Walker was identified as a suspect and was located at the apartment complex where he resided. After being advised of and waiving his Miranda rights, Walker gave a signed statement on September 3, 2004, admitting that he had participated in the robbery with "Shawn McCobb and his cousin B.J."[1] and saying that he was armed with "a brown stick like a nightstick" and that McCobb also had a stick. He said that two pizzas and some money were taken in the robbery, with McCobb getting all of the money.

In his statement, Walker described how he, McCobb, and "B.J." planned and executed the robbery:

Me and [McCobb] were at home and he wanted to go over to B.J.'s house because we did not have any food and he wanted to go over there and get something to eat. We walked over to B.J.'s house. When we got there, B.J. fixed [McCobb] a sandwich and fixed me a corn dog. I told them I was still hungry and he did not want to fix anything else. [McCobb] suggested that he buy some pizzas. Then B.J. told them that he only had $10 and [McCobb] was trying to make B.J. go and get one of his uncle's pistols. He has a couple of pistols there in his house.

---

[1] McCobb testified at trial that B.J.'s true name was Taurus Pointer, II.

So B.J. called and ordered the pizza. He asked me what kind I wanted and I told him hamburger. And so we called and ordered the pizzas. We talked about it and said let's catch him before he gets to the door. [McCobb] was going to do it by myself [sic] at first while B.J. stalled him at the door. Then they brought me into it saying that I had to hit him and knock him out. [McCobb] and myself are standing out under the carport and it is real dark.

Before he got there I had to go in and use the bathroom and when I came back out he was already there. And I tried to tell them to forget it. [McCobb] kept saying that we weren't going to have nothing to eat. I walked to the bushes and [McCobb] was behind me and I tried to turn around because I did not want to do it. And [McCobb] was like we got to do this. And [McCobb] was holding on to my back and pushed me forward. I jumped out of the bushes behind the delivery man and I stood there and he did not know that I was there behind him. I was going to wait until he turned around and tell him just to give me the money. I raised the stick up and was going to wait until he turned around. And he turned around and I acted like I was going to hit him and said give me the money.

When I swung the stick he was starting to run and he ran into the stick and he fell and I just stood there. He got up and started to run and [McCobb] chased him into the next-door neighbor's yard and the pizza man fell and [McCobb] was standing over him with the stick asking him for the money. [McCobb] told him that if he went into his pockets and found some more money that he was going to beat him. The pizza man pulled out some more money and gave it to him. [McCobb] threw the pizza box in the backyard and said he was going to throw the pizza away.

Sergeant Michael Brown, also of the Memphis Police Department, testified that Walker fled as officers were trying to arrest him but was apprehended about ten minutes later. Brown took a statement from McCobb on September 3, 2004, wherein he admitted his involvement in the robbery and confirmed that Walker and "Taurus Pointer, Jr." participated as well. McCobb said that he was armed with a pool stick and that Walker had a nightstick. McCobb explained how the robbery had occurred:

We went over to my cousin's house. We came over there to rap. When we got through rapping, we started talking about how we can get some money if we hit the pizza man. We weren't really just serious about it then. We ended up calling. When he came, me and [Walker] stood outside and waited. We waited on him. We thought he was going to park in the driveway but he parked in the street. He came up the driveway and he stood at the door. [Walker] waited until he gave him the drinks and hit him with the nightstick in the back of his head. When he hit him, the pizza man tried to run so I caught him halfway through the yard. He was crawling through the yard. I stood over him with the pool stick and he gave me the money, like two or three checks. It was balled up in the money. Then the guy got up and he

got in his car and left. We went back in the house. I took the checks out of the money, then we left and went home. That's it.

Defendant Walker testified that he answered the door when the victim arrived with the pizzas and gave him a coupon for their order. When the victim told Walker that the coupon was expired, Walker asked him to accept it anyway, but the victim refused to do so and, according to Walker, "got real loud and put his finger in [Walker's] face." McCobb then came to the door and told the victim, "You ain't coming over here with that disrespect." McCobb struck the victim, and the victim then hit McCobb. The victim then got in his truck and left but dropped the pizzas and sodas in the yard.

Walker acknowledged that he gave a different, inculpatory statement to the police but said he only did so because they "told me if I didn't own up to robbing the man that I would never see my son again." He further testified that the police promised to release him if he confessed.

Defendant McCobb testified that Walker was going to purchase the pizzas with a coupon, but when the victim arrived, he yelled at Walker. McCobb said that he then hit the victim because he was being disrespectful but denied having any weapons or taking anything from him. McCobb also acknowledged that he previously had confessed to the robbery but said he only did so because the police "told [him] to lie" and that "if [he] didn't say what they wanted [him] to say that [he] wasn't going to see the streets again."

## ANALYSIS

### I. Sufficiency of the Evidence

On appeal, the defendants argue that the evidence presented at trial was insufficient to support their convictions.

In consideration of this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) (2006); State v. Evans, 838 S.W.2d 185, 190–92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). This rule applies when the determination of guilt is based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (Tenn. 1963)). Additionally, a jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendants in this case were convicted of aggravated robbery:

 (a) Aggravated robbery is robbery as defined in § 39-13-401:

(1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; or

(2) Where the victim suffers serious bodily injury.

Tenn. Code Ann. § 39-13-402(a) (2006); see also Tenn. Code Ann. § 39-13-401(a) (2006) (defining robbery as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear").

"Deadly weapon" is also defined by statute:

(A) A firearm or *anything* manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or

(B) *Anything* that in the manner of its use or intended use is capable of causing death or serious bodily injury.

Tenn. Code Ann. § 39-11-106(a)(5) (2006) (emphasis added).

At the defendants' trial, the victim testified that Walker "stalled him" at the door before McCobb hit him with great force in the back of the head with a metal baseball bat, that he tried to run but fell down, and that McCobb stood over him with the bat raised demanding money. Additionally, in their statements to police officers, the defendants admitted that, armed with a nightstick and a pool cue, they robbed the victim and took money and pizzas from him. More specifically, McCobb told investigators that Walker hit the victim "with the nightstick in the back

of his head," and, while the victim was crawling across the yard, he "stood over [the victim] with the pool stick and he gave me the money."

Based on this evidence, a reasonable jury could conclude that the defendants intentionally stole property (money and pizzas) from the victim by striking him forcefully in the back of the head with a baseball bat. See Tenn. Code Ann. §§ 39-13-402(a)(1), -11-106(a)(5) (2006). This assignment is without merit.

## II. Propriety of the Defendants' Ten-Year Sentences

The defendants argue that the trial court misapplied certain of the enhancement factors and imposed excessive sentences. In this regard, we note that the defendants do not contest application of two enhancement factors, and this court has noted that application of a single factor can justify an enhanced sentence. See State v. Bolling, 75 S.W.3d 418, 421 (Tenn. Crim. App. 2001).

On June 6, 2006, the trial court held separate sentencing hearings for the defendants, finding five statutory enhancement factors applied to both defendants: (1) both had previous histories of criminal behavior, see Tenn. Code Ann. § 40-35-114(2) (2003);[2] (2) both were leaders in the commission of an offense involving two or more criminal actors, see Tenn. Code Ann. § 40-35-114(3) (2003); (3) the personal injuries sustained by the victim were particularly great, see Tenn. Code Ann. § 40-35-114(7) (2003); (4) they had no hesitation about committing a crime where the risk to human life was high, see Tenn. Code Ann. § 40-35-114(11) (2003); and (5) the crime was committed under circumstances under which the potential for bodily injury to a victim was great, see Tenn. Code Ann. § 40-35-114(17) (2003). As to Defendant Walker, the trial court applied one additional enhancement factor, that the felony was committed while he was on a form of release into the community under supervision, see Tenn. Code Ann. § 40-35-114(14)(E) (2003).

As for mitigation, the trial court found that two statutory factors applied to each defendant: (1) they lacked substantial judgment in committing the offense because of their youth, see Tenn. Code Ann. § 40-35-113(6) (2003); and (2) they were motivated by a desire to provide necessities for themselves or their families, see Tenn. Code Ann. § 40-35-113(7) (2003).

Both defendants were sentenced as Range I, standard offenders to ten years in the Department of Correction and ordered to pay a fine of $1000.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d)

_____

[2]Because the defendants were sentenced after June 7, 2005, for an offense committed before that date, but after July 1, 1982, they could have elected to be sentenced under the Criminal Sentencing Reform Act of 1989 as revised in 2005 by executing a waiver of their ex post facto protections, but they did not. See 2005 Tenn. Pub. Acts, ch. 353, § 18; see also Tenn. Code Ann. §§ 40-35-114, -210 (2006), Compiler's Notes. Accordingly, the Act's 2003 codification governs. See 2005 Tenn. Pub. Acts, ch. 353, § 18.

(2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). However, the presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App.1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

Because, as we will explain, we conclude that the trial court erred in application of certain of the enhancement factors, our review is *de novo*, without a presumption of correctness. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2006); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001) (citing Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986)). The appealing party bears the burden of showing the sentence is improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

## A. Applicable Enhancement and Mitigating Factors

As we have set out, neither defendant challenges the trial court's finding that factors (2) and (3), regarding their histories of criminal behavior and leadership roles in the commission of the offense, were applicable. However, they argue that the trial court erred in applying enhancement factors (7), (11), and (17). The State agrees that application of these three factors was erroneous.

The victim's testimony regarding his injuries was that his head, arms, and side hurt and that he had "a huge knot" on his head. Accordingly, we conclude that factor (7) was not applicable because the victim did not suffer "particularly great" personal injury. See Tenn. Code Ann. § 40-35-114(7) (2003); State v. Spratt, 31 S.W.3d 587, 607 (Tenn. Crim. App. 2000) (finding that application of this factor was inappropriate where the "only physical injuries [the victim] testified that she sustained during the attack were cuts on her head, bruises and scratches on her neck, and headaches that lasted for a few weeks"). However, the victim also testified that he was a kidney dialysis patient at the time of the robbery and was "real weak" as a result of his daily dialysis treatments. He also said that his legs and ankles were swollen the morning of the robbery and that he could not run without having a hard time breathing. These infirmities made him more vulnerable and less able to resist and escape from being chased and beaten, as occurred during the attack. Accordingly, we find to be applicable to both defendants enhancement factor (5), that the victim was "particularly vulnerable because of age or physical or mental disability." See Tenn. Code Ann. § 40-35-114(5) (2003); see also State v. Boggs, 932 S.W.2d 467, 473 (Tenn. Crim. App. 1996) (stating that "[a]

-7-

victim is particularly vulnerable within the meaning of this enhancement factor when the victim lacks the ability to resist the commission of the crime due to age, a physical condition, or a mental condition") (citing State v. Butler, 900 S.W.2d 305, 313 (Tenn. Crim. App. 1994)).

Regarding factors (11) and (17), "[t]his [c]ourt has previously held that 'absent any proof establishing risk to life other than the victim's . . . these factors are essential elements of [aggravated robbery]' and, therefore, inappropriate." State v. King, 905 S.W.2d 207, 213 (Tenn. Crim. App. 1995) (quoting State v. Hicks, 868 S.W.2d 729, 732 (Tenn. Crim. App. 1993)), overruled on other grounds by State v. Williams, 977 S.W.2d 101 (Tenn. 1998); see State v. Claybrooks, 910 S.W.2d 868, 872 (Tenn. Crim. App. 1994). As there is no evidence in the record that any life other than the victim's was put at risk by the defendants' conduct, the trial court's application of factors (11) and (17) was erroneous.

Walker additionally argues that it was error for the trial court to apply factor (14), that the offense was committed while on a form of release for a felony conviction. See Tenn. Code Ann. § 40-35-114(14) (2003). The trial court based application of this factor on the fact that Walker was on judicial diversion following his prior entry of a guilty plea to attempted aggravated burglary. The defendant argues that his being placed on judicial diversion had not required that he first plead guilty. As we will explain, we disagree with this view.

Tennessee Code Annotated section 40-35-114 states that a defendant's sentence may be enhanced when:

(14) The felony was committed while on any of the following forms of release status if such release is *from a prior felony conviction*:

(A) Bail, if the defendant is ultimately convicted of such prior felony;

(B) Parole;

(C) Probation;

(D) Work release; or

(E) *Any other type of release* into the community under the direct or indirect supervision of the department of correction or local governmental authority.

Tenn. Code Ann. § 40-35-114(14) (2003) (emphasis added).

Although this court has previously held that application of this factor is not appropriate where the defendant committed the offense for which he is being sentenced while on *pretrial diversion*, see State v. Linda Sue Kaywood and Ricky Harbin, Nos. 03C01-9901-CC-00041, 03C01-9901-CC-00042, 2000 WL 5044, at *5 (Tenn. Crim. App., Jan. 5, 2000), perm. to appeal denied (Tenn. July

31, 2000), we conclude that application of this factor may be appropriate when the defendant is on *judicial diversion*.

An important difference between the two is that a defendant released on the latter has been found guilty of or pled guilty to the offense for which diversion was sought. <u>Compare</u> Tenn. Code Ann. § 40-15-105(a)(1)(A) (2003) (permitting *pretrial diversion* when a qualified defendant and the State to enter into a memorandum of understanding that "prosecution will be suspended for a specified period") (emphasis added) <u>and</u> Tenn. Code Ann. § 40-35-313(a)(1)(A) (2003) (allowing a trial court to "defer further proceedings against a qualified defendant and *place such defendant on probation* upon such reasonable conditions as it may require without entering a judgment of guilty") (emphasis added); <u>see also</u> Tenn. Code Ann. § 40-35-313(a)(1)(B)(i)*(a)* (2003) (defining "qualified defendant" for the purposes of judicial diversion as someone who has been found or pled guilty).

Since the guilt of defendants on judicial diversion is established, and non-entry of judgment of conviction depends upon successful completion of the diversionary period, their circumstance is sufficiently analogous to being on release following a felony conviction to warrant application of this enhancement factor. Moreover, the judicial diversion statute terms the diversionary period of release "probation," which is a form of release specifically mentioned by the enhancement statute. <u>See</u> Tenn. Code Ann. §§ 40-35-313(a)(1)(A), -114(14)(C) (2003).[3] Accordingly, we conclude that the finding of guilt that occurs with an accepted guilty plea or guilty verdict needed for judicial diversion constitutes the "conviction" contemplated in Tennessee Code Annotated section 40-35-114(14)(C) (2003) and as concluded in <u>State v. Vasser</u>, 870 S.W.2d 543, 545 (Tenn. Crim. App. 1993).

Accordingly, we conclude that enhancement factors (2), (3), and (5) are applicable to both defendants and factor (14) additionally applies in Walker's case. We agree with the trial court that mitigating factors (6) and (7) should be applied in sentencing the defendants. Because, as we have set out, application of a single enhancement factor can justify an enhanced sentence, we conclude that the record supports the trial court's sentencing determinations.

### B. Length of Sentences

The sentencing range for a Range I, standard offender convicted of a Class B felony is eight to twelve years. Tenn. Code Ann. § 40-35-112(a)(2) (2003). As both enhancement and mitigating factors apply to the defendants in this case, the sentencing court "must start at the minimum sentence in the range, enhance the sentence within the range as appropriate for the enhancement factors, then reduce the sentence within the range as appropriate for the mitigating factors." Tenn. Code Ann. § 40-35-210(e) (2003).

Accordingly, with a sentence of eight years as our starting point, we conclude that the applicable enhancement factors warrant increasing the defendants' sentences to ten years.

---

[3]Under the 2005 amendment, this subsection became 40-35-114(13)(C). As we have set out, the statute, as amended, was not applicable to the defendants because they did not execute waivers allowing this to occur.

### III. Unconstitutional Fines

Walker additionally asserts that the trial court violated his constitutional right to have a jury impose any fine in excess of fifty dollars.

Initially, we note that neither defendant argued at sentencing or at their motions for a new trial that the trial court was without authority to impose their $1000 fines, and ordinarily, issues raised for the first time on appeal are considered waived. See Tenn. R. Crim. P. 12(b)(2), (f); Tenn. R. App. P. 3(e); State v. Maddin, 192 S.W.3d 558, 561 (Tenn. Crim. App. 2005) (stating that "[w]hen an issue is raised for the first time on appeal, it is typically waived"). Moreover, McCobb has not even presented the issue on appeal.

Nonetheless, we may consider Walker's argument under the doctrine of plain error. Rule 52(b) of the Tennessee Rules of Criminal Procedure provides that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. Crim. P. 52(b).

When determining whether such a review is appropriate, the following five factors must be established: "'(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused [must not have waived] the issue for tactical reasons; and (e) consideration of the error [must be] necessary to do substantial justice.'" State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)).

We conclude that each element necessary to support a finding of plain error is present in this case. Article 6, Section 14 of the Tennessee Constitution states:

> No fine shall be laid on any citizen of this State that shall exceed fifty dollars, unless it shall be assessed by a jury of his peers, who shall assess the fine at the time they find the fact, if they think the fine should be more than fifty dollars.

In light of this provision, our supreme court has ruled that there are only two circumstances in which a trial court acting *sua sponte* may impose a fine over fifty dollars: "(1) when the defendant waives the right for jury determination of the fine, State v. Sanders, 735 S.W.2d 856, 858 (Tenn. Crim. App. 1987), and (2) when the fine is statutorily specified and allows no judicial discretion in its imposition, France v. State, 65 Tenn. 478, 486 (1873)." State v. Martin, 940 S.W.2d 567, 570 (Tenn. 1997).

Here, the record does not show that the defendants waived this right, nor is a relevant fine delineated by statute. Rather, our examination of the record makes it clear that no mention of a fine was made in the jury charge or verdict, but the fines were independently imposed by the trial court.

Accordingly, we reduce the defendants' fines to $50 because it was constitutional error for the trial court to impose them on its own initiative.

### IV. Impeachment of Walker with Prior Offense that Resulted in Judicial Diversion

Walker argues that it was error for the trial court to allow the State to impeach him with the fact that "he had pled guilty to another felony involving dishonesty: criminal attempt aggravated burglary." In this regard, he makes three specific assertions: (1) the trial court erred by "utilizing Rule 609 of the Tennessee Rules of Evidence rather than Rule 608 to determine the appropriateness of the State's questioning and admissibility of the evidence;" (2) the State failed to give him adequate notice under Rule 608 of the Tennessee Rules of Evidence; and (3) "the scope of the questioning and evidence allowed went beyond that allowed under Rule 608."

The State concedes, and we agree, that Rule 609 of the Tennessee Rules of Evidence does not apply when a defendant-witness is impeached with a criminal prosecution that resulted in judicial diversion. See State v. Jesse Ross Tolbert, No. E1999-02326-CCA-R3-CD, 2000 WL 1172344, at *4 (Tenn. Crim. App. Aug. 18, 2000) (concluding that "when a defendant is granted judicial diversion there is no conviction within the meaning of Rule 609" and that the issue is governed by Rule 608) (citing State v. Schindler, 986 S.W.2d 209, 211 (Tenn. 1999); State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995)). Whether a defendant-witness should be impeached by prior conduct that resulted in judicial diversion, and what procedures must be followed to do so is governed by Rule 608. Id.

Accordingly, it was error for the trial court to conclude under Rule 609 that Walker could be questioned on cross-examination about his prior guilty plea that resulted in judicial diversion. While the trial court analyzed this issue under Rule 609, the safeguards of the applicable rule, Rule 608, were nonetheless fully observed, as we will explain.

Under Rule 608, a witness may be questioned on cross-examination about a prior bad act probative of the witness's character for untruthfulness if the trial court holds "a hearing outside the jury's presence [to] determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry." Tenn. R. Evid. 608(b)(1). In this case, before Walker testified, the trial court held a hearing outside the presence of the jury to determine if the State could question him on cross-examination regarding his previous guilty plea. The court concluded that the probative value of the "criminal conduct" outweighed its prejudicial effect. Conscious of the fact that Walker's prior guilty plea did not result in a conviction, the trial court ruled that the State could only inquire of him on cross-examination if he had previously *pled guilty to the offense.*

Secondly, Rule 608 requires that when "the witness to be impeached is the accused in a criminal prosecution, *the State must give the accused reasonable written notice* of the impeaching conduct before trial, and the court upon request must determine that the conduct's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Tenn. R. Evid. 608(b)(3) (emphasis added). Here, the State provided Walker with written notice five weeks prior

to trial that it intended to impeach him with his prior "conviction" for attempted aggravated burglary under Rule 609 if he took the stand to testify on his own behalf. Although the State styled the notice as being in compliance with Rule 609, when viewed in conjunction with the hearing on this issue, it was adequate to give Walker the reasonable notice required by Rule 608.

As such, Walker's argument is untenable that had he "believed the State would be allowed to utilize the matter despite its failure to file the appropriate notice, the defense may have forgone the right to trial and pursued another manner of disposition of the case." Based on the State's written notice and the trial court's hearing on the matter, Walker was fully aware that if he went to trial and took the stand, he might be questioned about the prior bad act.

Walker argues that the "scope of questioning allowed by the trial judge was improper." The trial court ruled that the State could ask Walker, "[D]id you enter a guilty plea," rather than ask if he had previously been convicted of the offense. At trial, the following exchange occurred between Walker and the State:

Q. And back in March 30th of 2004 did you also plead guilty to a criminal attempt aggravated burglary?

A. Yes, ma'am, but I was placed on diversion.

As this court has previously stated, the terms of the diversion statute "preclude reference to any criminal proceedings incident to the process, but do not prohibit questions about the underlying misconduct." Dishman, 915 S.W.2d at 464. Accordingly, the State should have been limited to questioning Walker about his involvement in the criminal act and restricted from asking about the legal proceedings attendant thereto. See id.

However, we conclude that this error does not necessitate setting aside the judgment of the trial court because, in consideration of the record as a whole, it is not probable that Walker was prejudiced by the error. See Tenn. R. App. 36(b) (stating that an otherwise appropriate final judgment "shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process").

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court but modify the fines imposed to $50 each.

_____
ALAN E. GLENN, JUDGE

-12-